Filed 11/26/25  In re B.W. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re B.W., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BYRON W.,<br><br>    Defendant and Appellant. | E086048<br><br>(Super.Ct.No. DPSW2500078)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Sean P. Crandell, Judge. Affirmed in part; reversed in part and remanded with directions.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

Appellant Byron W. (father) challenges the findings and orders made during the contested jurisdiction hearing held on May 1, 2025. He contends the juvenile court (1) erred in asserting dependency jurisdiction because the evidence is insufficient to find his daughter, B.W., was at substantial risk of harm (Welf. & Inst. Code,[1] § 300, subd. (b)(1)), and (2) erred in removing her from his care or finding a reasonable means by which she could be protected without removal (§ 361, subds. (c)(1), (d)). We agree there was insufficient evidence as to one of the jurisdiction allegations. We also agree that the evidence fails to support the finding that reasonable efforts were made to prevent or eliminate the need for B.W.'s removal from father's custody. We reverse the disposition order and remand for a new disposition hearing in compliance with section 361 and the views expressed in this opinion.

## I. PROCEDURAL BACKGROUND AND FACTS

*A. Referral and Investigation.*

On January 22, 2025, Riverside County Department of Public Social Services (the Department) received a referral for general neglect regarding the children, K.F. and B.W. (born 2024).[2] K.F. had 23 absences and 42 tardies to school, and she said mother could not wake up at times to take her to school. On January 17, 2025, when mother picked up K.F. from school she hid her face, which was swollen and her eyes were red and swollen

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] This appeal only involves B.W. K.F. will be referred to only as necessary.

shut. Mother failed to return multiple calls from the school and K.F. has been absent since January 17th.

On January 29, 2025, K.F. told the social worker that she was living with mother, her baby sister, and "her uncle dad," who she refers to as "'Bizz.'" K.F. denied any domestic violence against her mother, claimed mother's eyes were tired because she does not sleep from watching B.W., and stated mother was injured in November 2024 when she crashed into another vehicle because she had been drinking. When the police arrived at the car accident, K.F., B.W. and mother hid at an aunt's house.

During a home visit on February 4, 2025, the social worker spoke with mother who stated that she lives only with her two children, father helps her care for them, and she denied substance abuse. Mother called father via FaceTime. He confirmed his criminal history and his probation status and stated that he was no longer "in that lifestyle" after being shot in the head in 2016. Father denied domestic violence, child welfare history, and substance and alcohol abuse. He confirmed mother's arrest for a DUI but claimed she informed him that she tested below the legal limit; he bailed her out around 3:00 a.m. He did not believe he needed services because the current referral was regarding mother, not him. The social worker provided mother with a resource packet, and mother said she was in the process of addressing the criminal matter relating to her DUI arrest.

According to the police report from mother's August 2024 DUI, a male (M.J.) and female (mother) were assaulting each other in a vehicle while a newborn was in an unsecured car seat. Mother was in the driver's seat, there was an empty tequila bottle on

3

the rear driver's side floorboard of the vehicle, and mother was "insulting, loud, her speech was rapid, her eyes were bloodshot and watery, her balance was unsteady, and she had a moderate alcohol odor emitting from her breath." She was arrested for child endangerment; blood draw test results indicated her blood alcohol content of 0.192 percent at the time of arrest. In February 2025, the social worker attempted to engage mother in services; however, she became upset and yelled, "Why does the Department keep insisting this and pushing the matter! I do not have an alcohol abuse problem."

On March 7, 2025, the social worker was informed that mother had committed battery on a woman who was pregnant with father's child. On March 3, Mother went to the father's home, made threats, "'beat up'" the woman, and fled the scene before law enforcement arrived. Four days later, the social worker left a message for father at his last known number; he did not respond. Police service calls for father's address revealed that on March 3, 2025, a call was received that mother broke the window to the father's home, climbed through the window, and proceeded to assault the seven-month pregnant woman. The woman's other children and their grandmother were present. Mother fled the scene before law enforcement arrived. The woman declined to press charges. The social worker verified that the front window of father's home was broken out.

B. *Detention.*

On March 17, 2025, the Department initiated dependency proceedings for B.W. pursuant to section 300, subdivision (b)(1).[3] According to the detention report filed that

___

[3] At the jurisdictional hearing, dependency as to K.F. was terminated following the juvenile court's award of sole physical custody to K.F.'s father.

same day, on March 13, the social worker attempted to take the children into protective custody with Riverside County Sheriff deputies. The social worker called mother, and she refused to make herself and the children available. Father got on the phone. He was aware of the Department's open investigation but stated, "Well, was it my job to keep in contact with the Department?" Mother refused to allow the social worker to bring the children to the agency's office to comply with the court orders. Father said that B.W. was with him but refused to provide the address. The parents were verbally (and via text message) notified of the detention hearing set for March 18, 2025, at 8:00 a.m., and advised to bring the children to court that day. The social worker connected her supervisor to the phone call. When mother was informed of the reasons why the Department had concerns for the children being in her care, she was belligerent and combative. Likewise, when father was advised that he was not forthcoming about mother's assault on his pregnant girlfriend, he started to become loud and argumentative. The call was disconnected when he would not allow the social worker or supervisor to speak.

The report noted father's criminal history. In May 2017, he was convicted of being a felon in possession of carrying a loaded firearm; he was sentenced to state prison for 48 months. (Pen. Code, §§ 29800, subd. (a)(1), 25850, subd. (c)(6).) In 2014, he was convicted of the unlawful taking or driving of a vehicle without the owner's consent. (Veh. Code, § 10851.) In 2012, he was convicted of second degree burglary, receiving stolen property, and having a prior felony conviction. (Pen. Code, §§ 459, 496, subd. (a),

667, subds. (c), (e)(1).) In 2009, he was convicted of driving under the influence. (Veh. Code, § 23152, subd. (b).)

At the initial detention hearing on March 18, 2025, father argued there is nothing in the report "that [he] has done wrong" except for the Department being "upset about his reaction to them coming to pick up the children for protective custody warrant." He faulted the Department for failing to "continuously contact" or interview him during its investigation, assess his home, or analyze him for any potential predetermined services. He asserted he had 50/50 custody, and there is no showing of "any possibility of" substantial harm from him. The hearing was continued to March 20; the court removed B.W. from parents' custody, set a contested hearing for March 26, and ordered supervised visitation.

The Department filed an amended petition alleging mother neglects the health, safety, and wellbeing of B.W., and father knew or reasonably should have known of the mother's concerning behaviors (specifically assaulting the mother of his other children at his home) but failed to intervene and ensure that B.W. was provided with adequate supervision, care, and protection, and has a significant criminal history. At the hearing, father again asserted the "only allegations against [him are] that he knew or should have reasonably known that mother has concerning behaviors" and he has a criminal history, both of which fail to demonstrate a substantial risk of harm. The juvenile court detained B.W. and ordered supervised visitation for father twice a week for two hours, liberalized as deemed appropriate and set a contested jurisdiction hearing.

*C. Jurisdiction/Disposition Report, Addendum Report, and Hearings.*

According to the jurisdiction/disposition report filed April 14, 2025, the Department recommended the juvenile court find the allegations concerning B.W. true, declare her a dependent of the court, and provide family maintenance services to both parents. The Department was not granted permission to interview father regarding the allegations in the petition. As of March 31, he was not enrolled in services, but indicated he would enroll in counseling and parenting education. He wanted the child returned to his care, but if that was not possible then he wanted her placed in the care of the paternal aunt, paternal uncle, or mother. According to the Department, the child was at continued risk of abuse and neglect due to mother's history of alcohol abuse and father's failure to protect her by allowing her to remain in mother's care. On April 17, 2025, the juvenile court conducted a hearing to determine whether to place B.W. with a paternal aunt. The paternal aunt testified about her previous child welfare history, and about a time when a former partner assaulted her at a grocery store. The court placed B.W. with her godmother and continued the jurisdiction hearing. A second amended petition was filed that same day.

In its addendum report filed April 28, 2025, the Department advised that it had received a new referral on April 21 with allegations of general neglect when the mother of father's other children gave birth at 37 weeks gestation and tested positive for THC. She admitted to using THC during her pregnancy, and she has a history of cocaine use. The baby was admitted to the NICU due to its gestational age. The Department opined that "[u]ntil the parents recognize the dangers associated with alcohol abuse, violent acts

7

and not providing appropriate care to the children, the supervision of the Court and Department is believed to be vital to ensure the children's safety and protection. Services such as domestic violence services, mental health services, substance abuse services and parenting education will need to be in place and the parents will need to avail themselves to the orders and services and the parents will need to demonstrate they can suitably keep a safe home for the children. The parents are in need of the Department's supervision, coaching, and re-direction to ensure the threats and risk factors are mitigated, and the children can be safely returned to a safe environment."

At the contested jurisdiction/disposition hearing, mother asked the juvenile court to dismiss the petition, arguing she was never charged for the alleged battery against father's girlfriend and her nine-month-old arrest for DUI no longer indicated a risk of harm to B.W. Father again challenged the allegations in the petition by arguing (1) his criminal history "shows absolutely nothing as to a current risk of substantial risk of harm to the children," (2) he knew of mother's DUI but since she told him she was under the legal limit there is no reason for him to have known or reasonably known that B.W. was at any risk of harm, (3) mother's assault on his pregnant girlfriend did not happen, (4) the Department has failed in its duty to provide services to him, and (5) he has offered to get a restraining order against mother. In response, the child's counsel argued there is a substantial danger to B.W.'s physical and/or mental health because father has seen a pattern of anger with mother, but has done nothing to make sure his child is safe, he has done nothing to assume custody of her, and he has stood up and said, "No, none of this happened."

8

The juvenile court considered the "totality of the circumstances and some of the interconnection between" and stated that it would incorporate some of the arguments made by the Department and B.W.'s counsel into its factual findings. The court faulted the parents' attorneys for focusing on the petition in a vacuum. It acknowledged that the evidence surrounding mother's DUI arrest was not as recent as in some cases, but noted that she exhibited a pattern of alcohol abuse and dangerous behavior. It also found that father "knew she was driving with the DUI, and he did nothing about it." The court analogized mother's situation to a daycare provider accused of child molestation, explaining that most parents would not send their child to that daycare anymore, adding, "Now, this is not the same thing as child molestation." Regarding mother's alleged break-in at father's home, the court reasoned the absence of criminal charges or a restraining order was "not controlling." On the topic of removal, the court found "clear and convincing evidence of circumstances in Section 361 as to both parents." The court sustained the petition as pled, ordered B.W. removed from parental custody, and ordered reunification services for both mother and father. Following this ruling, mother uttered multiple expletives and father said, "They really just do whatever they want." A six-month review hearing was scheduled for November 5, 2025. Father appeals.

## II. DISCUSSION

### A. Jurisdictional Findings.

Father contends the juvenile court erred in asserting dependency jurisdiction under section 300, subdivision (b)(1), because his ignorance of mother's "concerning

behaviors," failure to "intervene," and criminal history did not constitute a substantial risk of harm. We are not persuaded.

"'The purpose of California's dependency law is "to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." [Citation.] In its effort to achieve this overarching goal, the law balances a number of vital interests: children's interests in safe and stable homes; parents' interests in raising their children; families' shared interests in each other's companionship; and the state's interest in protecting society's most vulnerable members.' [Citation.]

"'Dependency proceedings span up to four stages: jurisdiction, disposition, reunification, and permanency. [Citations.] At the jurisdictional stage, the juvenile court determines whether to declare a child a dependent of the court because the child is suffering, *or at risk of suffering*, significant harm.' [Citation.] '"A dependency adjudication is a preliminary step that allows the juvenile court, within specified limits, to assert supervision over the endangered child's care." [Citation.] After the juvenile court takes that preliminary step, the court may impose limitations on parental authority as necessary to protect the child. [Citations.] It may also order that the child be removed from a parent's physical custody if there is clear and convincing evidence that removal is necessary to protect the child from a substantial risk of harm. [Citations.] In some cases, a dependency adjudication may lead to termination of parental rights.' [Citation.]" (*In re N.R.* (2023) 15 Cal.5th 520, 537, italics added.)

10

Relevant to this case, the juvenile court may adjudge a child to be a dependent of the court under section 300, subdivision (b)(1)(A) if "there is a substantial risk that the child will suffer, serious physical harm or illness . . . [¶] . . . [by t]he failure or inability of the child's parent . . . to adequately supervise or protect the child," or (b)(1)(B) if "there is a substantial risk that the child will suffer, serious physical harm or illness . . . [¶] . . . [¶] [by t]he willful or negligent failure of the child's parent . . . to adequately . . . protect the child from the conduct of the custodian with whom the child has been left." A jurisdictional finding under section 300, subdivision (b)(1), requires the social services agency to demonstrate the following three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness. (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; see *In re R.T.* (2017) 3 Cal.5th 622, 624.) These elements must be established as of the time of the jurisdictional hearing. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.) "[P]revious acts . . . standing alone, do not establish a substantial risk of future harm; there must be some reason beyond mere speculation to believe they will reoccur." (*In re Emily L.* (2021) 73 Cal.App.5th 1, 15.) We apply the substantial evidence test to the juvenile court's jurisdictional findings. (*In re G.Z.* (2022) 85 Cal.App.5th 857, 876; *In re J.N.*, at p. 1022.)

*1. B-4 allegations.*

B-4 alleged that father "knew or reasonably should have known the mother has concerning behaviors, to include assaulting the mother of his other children at his home, and he has failed to intervene and ensure his child, [B.W.], was provided with adequate

supervision, care and protection; such conditions place the child at risk of physical and/or emotional harm." In sustaining this allegation, the juvenile court found that father knew or reasonably should have known about mother's "concerning behaviors" and failed to "intervene" to protect B.W. He disagrees.

Father concedes the "reported evidence showed a pattern of alcohol abuse and escalating dangerous behavior *by mother* that was sufficient to support dependency jurisdiction even if some of the sustained language was factually incorrect." He further acknowledges that mother (1) was arrested for DUI in August 2024 while the children were in her car and her blood-alcohol level was more than twice the legal limit, (2) crashed into a parked car in November after drinking, again with the children in the car, (3) was reported by school staff as having red, swollen eyes with K.F. repeatedly missing school, (4) was involved in several domestic violence incidents with her male companion, and (5) broke into father's home in March 2025 and attacked his pregnant girlfriend. Nonetheless, he contends that "vision in hindsight is 20/20" and the Department failed to show that a reasonable parent in his position would have been compelled to petition a family law court for sole physical custody of B.W. based on knowledge of mother's dangerous behavior.

According to father, there is no evidence that he was aware of mother's car crash in November, the school staff's concerns, or the domestic violence between mother and her male companion. Regarding her DUI, he asserts that he only knew what mother told him, that she tested below the legal limit. Moreover, he maintains that it was reasonable for him to rely on the Department's decision not to seek restrictions on mother's custody

and accept the parents' agreement that she would not drive the children, and she would be referred for services. We disagree.

Unlike father, the Department was unaware of mother's 2024 DUI and car crash until late January 2025. In contrast, he was aware of her DUI when it happened, and he was or should have been aware of the car crash since he admitted to "often tak[ing] [K.F.] to school even though she is not his biological child" because mother did not have a car. Contrary to his assertion, mother's attack on his pregnant girlfriend was not "a single isolated incident" "that had only an attenuated connection to B.W.'s physical safety." The attack was one more incident where mother engaged in domestic violence, adding to a pattern of concerning behaviors. Substantial evidence supports the juvenile court's finding that father knew or reasonably should have known that mother's concerning behaviors presented a substantial risk that B.W. would suffer serious physical harm or illness.

*2. B-5 allegations.*

B-5 alleged that father "has criminal history including a 2017 conviction as to being a convicted felon or narcotics addict owning or possessing a firearm and carrying a firearm while not listed on the DOJ." Citing *In re J.N.* (2021) 62 Cal.App.5th 767 (*J.N.*), father asserts the Department failed to present evidence connecting his past offenses to any type of defined risk of harm to B.W. We agree.

In *J.N.*, "the sole evidentiary basis for the jurisdictional finding as to [f]ather" was "his incarceration and criminal record." (*J.N.*, *supra*, 62 Cal.App.5th at p. 775.) On appeal, the father argued, and the appellate court agreed, that the record did not support

13

the jurisdictional findings that his incarceration and criminal history placed his child at substantial risk of harm. (*Ibid.*) The court explained: "Nothing in the record suggests any of [f]ather's crimes were against children or involved children. The record also does not support that [f]ather's criminal conduct ever placed [the child] in danger during the approximately two years he appears to have been involved in [the child]'s life. And although [the Department] may be correct that [f]ather exposing [the child] to his criminal ways could put [the child] at risk, the record does not provide any nonspeculative basis for the court to conclude that [f]ather is likely to do so." (*Ibid.*) Notably, in *J.N.*, the father "was not convicted of any crime involving domestic violence." Although there had been a single allegation of domestic violence in the past, it was determined to be inconclusive. (*Id.* at p. 776.)

Here, none of father's crimes were against children or involved children, nor is there any evidence showing that his past criminal behavior ever endangered B.W. Moreover, his criminal history is less violent and less serious than that of the father in *J.N.* Unlike the offenses in *J.N.*—which included assault with a deadly weapon likely to produce great bodily injury—father's past offenses include being a felon in the possession of a firearm, taking a vehicle without the owner's consent, second degree burglary, and a 2009 DUI. (*J.N.*, *supra*, 62 Cal.App.5th at p. 772-773.) Like our colleagues in *J.N.*, "we [do not] accept that a parent's violent criminal record, without more, *necessarily* establishes that a parent has a violent disposition sufficient to establish the requisite risk of physical harm to a particular child." (*Id.* at p. 776.) Since the record

14

does not contain substantial evidence to support the jurisdictional finding based on the b-5 allegations, it must be reversed.

*B. Disposition Order.*

Father contends the removal order against him must be reversed because the Department failed to prove, by clear and convincing evidence, that there would be a substantial danger to B.W. if she lived with him, and there were no reasonable means to protect her without removal. (§ 361, subds. (c)(1), (d).)

Where removal from a parent is at issue, the juvenile court must make findings under section 361, subdivision (c). The court must find, by clear and convincing evidence, that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [child] if the [child] were returned home," that there are no reasonable means short of removal to protect the minor, and that the social services agency made reasonable efforts to avoid removal. (§ 361, subd. (c)(1).) Subdivision (c)(1) identifies two alternatives for the court to consider "as a reasonable means to protect the [child]," one of which, as relevant here, is "[a]llowing a nonoffending parent . . . to retain physical custody as long as that parent . . . presents a plan acceptable to the court demonstrating that they will be able to protect the child from future harm." (§ 361, subd. (c)(1)(B).) We review the court's removal findings for substantial evidence. (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.)

Repeating his prior claim that the "only jurisdictional findings sustained against [him] were not supported by substantial evidence," father argues removal of B.W. from his custody was unwarranted, and the record shows no causal link between his

girlfriend's marijuana use and any defined risk of harm to B.W.  We are not persuaded.

The juvenile court removed B.W. pursuant to section 361, subdivision (c)(1).  The evidence shows that father repeatedly represented that he had 50/50 custody of B.W. with mother.  He was active in mother's home, assisting with both of her children.  He was aware of her DUI and the fact that she no longer had access to her car since he drove K.F. to school.  Given his "active" role in assisting mother, along with his shared custody of B.W., father reasonably should have known what happened to mother's car.  Likewise, he should have known that mother broke into his home and assaulted his pregnant girlfriend.  However, he claimed ignorance or denied mother's action.  Accordingly, substantial evidence supports a removal order.

Nonetheless, father challenges the sufficiency of the evidence to support the finding that there were no reasonable means by which B.W.'s physical health could be protected without removal from his custody.  (§ 361, subd. (c)(1).)  He argues, "Assuming that simply placing B.W. with [him] would pose a substantial danger, the juvenile court could have protected her safety by (1) ordering a home assessment to ensure the absence of any safety hazards in the home, (2) conditioning her release on [his] continued participation in services, and (3) directing the [D]epartment to conduct unannounced visits to the home."  He further asserts the Department failed to conduct a home assessment and present it to the court, delayed providing referrals to him, supplied inaccurate information to the service agencies, and never discussed any plan to maintain B.W. with him.  We agree.

16

The Department "has a duty to ensure that 'reasonable efforts [are] made to prevent or eliminate removal' of the Children." (*In re M.V.* (2022) 78 Cal.App.5th 944, 964.) "[R]easonable efforts, like reasonable services, need only be reasonable under the circumstances, not perfect." (*In re H.E.* (2008) 169 Cal.App.4th 710, 725.) Here, we cannot say that the record, even when viewed in the light most favorable to the Department, contains substantial evidence that it made reasonable efforts to prevent or eliminate the need for removal.

As discussed, the primary source of danger to B.W.'s well-being was mother. There is no evidence the child was in danger while solely in father's care. According to the detention report, the Department's "reasonable efforts" to prevent removal involved mother only. As to father, it reported that he "could benefit from individual counseling and parenting education, pending further investigation." The jurisdiction/disposition report notes that father "said he would like to have [B.W.] placed in his care" and was willing to "enroll in counseling and parenting education in order to have [her] back in his care." When father was advised of concurrent planning, he stated "he would like the child to be returned to his care." There was no discussion as to whether reasonable means were available to protect B.W. without removal from father's custody. While referrals on father's behalf were sent to both counseling and SafeCare parenting education on April 4, 2025, as of the time of the contested hearing he had not been contacted. As father's counsel argued, "[T]here are reasonable means to protect [B.W.'s] physical health. Father has offered to get a restraining order.· Father has offered to participate in services.· Father has offered to do anything that is being asked of him.· And

17

the Department has not utilized those things.· It seems that they simply made up their mind, before the protective custody warrant was even issued, they were going to take the child from the parent's care over something that . . . allegedly happened in August."

In short, although the Department may have referred father to a few services, it does not appear on this record that it assisted him in any meaningful way to avoid B.W.'s removal from his custody. Accordingly, we find no substantial evidence to support the juvenile court's finding that reasonable efforts were made to prevent or eliminate the need for removal. Under section 361, subdivision (e), the court may not order a child removed from parental custody without finding that reasonable efforts were made to prevent or eliminate the need for removal. Because we conclude the court's finding in this regard is not supported by substantial evidence, we reverse the disposition order and remand the matter for a new disposition hearing. On remand, the court is to make its decision based on the facts existing at the time of the new disposition hearing. (See *In re Ashly F.* (2014) 225 Cal.App.4th 803, 811.)

## III.  DISPOSITION

The jurisdiction finding based on father's criminal history (b-5) is reversed, the finding based on father's knowledge of mother's concerning behaviors (b-4) is affirmed. The disposition order is reversed and remanded for a new disposition hearing in compliance with section 361 and the views expressed in this opinion.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER_____
J.

We concur:

RAMIREZ_____
P. J.

FIELDS_____
J.

19